## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cr-30039 |
| | ) | |
| JACQUES GHOLSTON, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENTATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Defendant Jacques

Gholston's Motion to Suppress (d/e 8) (Motion).   For the reasons set forth

below, The Motion should be DENIED.

## <u>BACKGROUND</u>

On July 10, 2018, a Grand Jury issued an Indictment (d/e 1)

(Indictment) charging Gholston with one count of possession of 5 grams or

more of methamphetamine (actual), with intent to distribute, in violation of

18 U.S.C. § 841(b)(1)(B).  On April 29, 2018, Quincy, Illinois, Police Officer

Erik Cowick arrested Defendant when he and other officers found

methamphetamine in a truck Gholston had been driving.  On September

18, 2018, Gholston filed the Motion.  The Court held an evidentiary hearing

on the Motion on March 25 and 26, 2019.  Defendant appeared in person

with his attorney Assistant Federal Public Defender Thomas Patton.

Assistant U.S. Attorneys Matthew Weir and Victor Yanz appeared for the

Government.  A transcript of that hearing has been completed and the

parties have submitted their post-hearing memoranda.  The matter is ready

for this Court's recommendation.

<u>STATEMENT OF FACTS</u>

Shortly after midnight on April 29, 2018, Officer Cowick patrolled in

uniform in a marked squad car in the City of Quincy, Illinois, in the vicinity

of 5th and Chestnut Streets.  Officer Cowick testified that the area was a

"high crime, high drug, gang activity" area.   <u>Transcript Vol. 1 (d/e 21)</u>, at 8-

9.[1]  Officer Cowick recorded his patrol with a video camera mounted on the

front dashboard of his marked patrol car.  Officer Cowick also wore a

wireless microphone.  During routine patrolling, the audiovisual equipment

recorded video but not sound.  The equipment started recording audio from

Officer Cowick's microphone when Officer Cowick turned on his squad

car's emergency lights.  <u>Transcript Vol. 1</u>, at 13.  The audio-visual

recording of the incident leading up to Gholston's arrest was admitted into

evidence.  <u>Government Exhibit A</u>. Unless otherwise indicated, the

---

[1] The Transcript is filed in two volumes (d/e 21 and 22).  Volume 1 contains the transcript of proceedings on March 25, 2019 (pages 1-131), and Volume 2 contains the transcript of proceedings on March 26, 2019 (pages 132-237).

sequence of events, quotations, and timing is based on the Court's review of the audiovisual recording, including the time stamp on the recording. Neither party disputes the accuracy of the audiovisual recording or the time stamp.

At approximately 12:15 a.m., Officer Cowick was driving on 5th Street. Officer Cowick saw a green pickup truck with a toolbox in the bed (Truck) traveling in the opposite direction on 5th Street. Several individuals had told him that Gholston sold methamphetamine from a green pickup truck with a toolbox in the bed. Officer Cowick knew the name of one of these individuals, Taylour Toolate. Transcript Vol. 1, at 48. Toolate was addicted to methamphetamine. Toolate had provided Officer Cowick with information about criminal activity in the area. Officer Cowick had not used the information she provided to secure an arrest warrant or arrest anyone. Transcript Vol. 1, at 49-50. She said Gholston was picking up large quantities of methamphetamine. She indicated that Gholston was selling methamphetamine using a green pickup truck. She told Officer Cowick that he kept the drugs in a magnetic box attached to the bottom of the truck and gave Officer Cowick the location where the Truck was parked. Transcript Vol. 1, at 52. Officer Cowick knew that Toolate had a relationship with someone in Gholston's family, and so, knew information about Gholston's

family.  Transcript Vol. 1, at 126-27.  Cowick went to the location Toolate gave him and confirmed that the green truck she described was parked there as she said.  Transcript Vol. 1, at 127.

Officer Cowick testified that he was "pretty positive" that Toolate was the first person to tell him that Gholston was selling methamphetamine out of a green truck.  He conceded, though, that there could have been someone who gave him this information before Toolate did.  Transcript Vol. 1, at 54.  Officer Cowick was not sure when she told him this information. He estimated two months before the April 29 traffic stop, but he was not sure.  Transcript Vol. 1, at 51-52.  Toolate was in custody from January 10, 2018, until after the April 29, 2018 traffic stop, so she told Officer Cowick this information some time before January 10, 2018.  See Defendant's Post Hearing Brief in Support of His Motion to Suppress and Reply to the Government's Post Hearing Brief (d/e 25), at 21, and attached Excerpts of Adams County Circuit Court Docket Sheets for Criminal Proceedings against Toolate in Case Nos. 2015 CF 126, 2017 CF 938, and 2017 CM 427.[2]

When the opportunity presented itself, Officer Cowick questioned individuals arrested for drug violations about where they got their drugs.

---

[2] The Court takes judicial notice of these public records from the Adams County Circuit Court.

He was often told by these individuals that Gholston sold methamphetamine from a green truck.  Transcript Vol. 1, at 53.  Officer Cowick did not document the information he received from Toolate or the other individuals arrested for possession of methamphetamine.  Transcript Vol. 1, at 55.

Prior to this traffic stop, Officer Cowick spoke to other officers who confirmed that Gholston had multiple convictions for drug trafficking and had just completed federal supervised release for a methamphetamine-related crime.  Officers previously told him that, at one time, Gholston was one of the top dealers in Quincy, that he had been charged multiple times with possession of methamphetamine, and that he would resist arrest and possibly run.  Transcript Vol. 1, at 20-22.  Officer Cowick collected this type of information over time "so that I could use that again to make a stronger case if I were ever to be able to get him in a traffic stop or do anything with it."  Transcript Vol. 1, at 53.

At 12:16 a.m., the Truck passed Officer Cowick traveling in the opposite direction.  Officer Cowick testified that he verified the license plate number on his inboard computer to confirm that the Truck was the green truck used by Gholston.  Transcript Vol. 1, at 58-59.  Officer Cowick then turned his squad car around and followed the Truck.  The Truck made a

right turn from 5th Street onto Chestnut Street. The Truck turned without signaling. When Officer Cowick saw this traffic violation, he sped up to catch the Truck. Officer Cowick turned on his emergency lights at 12:17 a.m., just as he made the turn from 5th Street onto Chestnut Street. The video shows that after Officer Cowick completed his turn onto Chestnut Street, the Truck was parked on Chestnut Street between 5th Street and 4th Street. Transcript Vol. 2, at 182. Still at 12:17 a.m., as Officer Cowick drove down Chestnut street with his emergency lights flashing, Gholston walked away from the Truck and crossed to the other side of Chestnut Street out of the view of the video camera. Officer Cowick testified that "there's only certain reasons why someone would walk away from a traffic stop in this area, and typically that means narcotics of some sorts." Transcript Vol. 1, at 81. At 12:17 a.m., Officer Cowick stopped the squad car just behind the Truck.

Officer Cowick notified his dispatcher that he was making the traffic stop and then called out to Gholston to stop. Cowick testified that he and Gholston made eye contact. Gholston, however, kept walking away. Cowick exited his squad car and ran after Gholston calling for Gholston to stop. Gholston stopped and came back to the Truck. Transcript Vol. 1, at 15.

Officer Cowick asked Gholston why he did not come back when Officer Cowick instructed him to do so.  Still at 12:17 a.m., Gholston told Officer Cowick he did not see him.  At 12:18 a.m., Officer Cowick handcuffed Gholston for officer safety and because Gholston walked away from the traffic stop of the Truck.  Cowick told Gholston that he was not under arrest, only detained.  Gholston said that Officer Cowick did not turn on his lights ("red and blues") until he came up on the Truck.  Officer Cowick asked Gholston why he did not stop once he saw the lights. Gholston said he did not know Cowick was after him.  At 12:18 a.m., Officer Cowick patted down Gholston to check for weapons and radioed for back up.  Transcript Vol. 1, at 67.

At 12:19 a.m., Officer Cowick had Gholston sit on the curb in front of the squad car and directly behind the Truck, in full view of the camera.  At that moment, Officers Mike Cirrincione  and Paul Hodges appeared at the scene.  Officer Cowick asked Gholston for his license.  Gholston told Cowick the license was in the Truck, but Gholston would not let Cowick retrieve the license.  Gholston told Officer Cowick that he would provide identifying information to Officer Cowick.  See Transcript Vol. 1, at 72, 123-24.  While Gholston and Officer Cowick talked, the other two officers walked around the exterior of the Truck.  Gholston turned away from Officer

Cowick several times to see what the two other officers were doing near the Truck.

At 12:20 a.m., Officer Cowick asked Officer Hodges to speak to him privately away from Officer Cirrincione and Gholston. Officer Cowick told Officer Hodges that Gholston had walked away from the Truck when Officer Cowick stopped it. Cowick said he believed Gholston was carrying drugs in the Truck. Officer Hodges suggested asking for consent to search. During this conversation, Officer Cowick radioed in Gholston's name to dispatch. At 12:22 a.m., the dispatcher told Officer Cowick that there was an outstanding Notice of Violation (NOV) for Gholston at the station. An NOV is notice of a city ordinance violation, usually a parking ticket or some other non-moving traffic violation. Transcript Vol. 1, at 22, 39-41.

Officer Cirrincione testified that he spoke to Gholston while Officer Cowick and Hodges were conferring. Officer Cirrincione testified that he asked Gholston why he stopped the Truck. According to Officer Cirrincione, Gholston answered that he stopped because he saw Officer Cowick's squad car turn around behind him on 5th Street. Transcript Vol. 2, at 200.

At 12:22 a.m., Officer Cowick walked back to Gholston and asked for permission to search him. Gholston consented. While Officer Cowick searched Gholston, the other two officers again walked around the Truck and looked in its windows. While Officer Cowick searched him, Gholston turned his head several times to look at other the two officers near the Truck. Officer Cowick also asked for permission to search the Truck. Gholston refused permission to search the Truck.

At 12:24 a.m., Officer Cowick and Cirrincione went back to the squad car. While Officer Cowick was in the squad car, Officer Cirrincione stood next to the driver's window at the car. Transcript Vol. 2, at 200. Both are out of view of the camera. Officer Cowick remained in his squad car from 12:24 to 12:33 a.m. During this time Officer Cowick communicated with Dispatch and other officers and prepared a warning for failure to signal when making a right turn. Officer Cowick typed in the information by hand to prepare the warning. Typing the information in by hand took several minutes. Officer Cowick had to type in all the background information about Gholston because Gholston refused to provide his license. If Gholston had provided his license, Cowick could have scanned in the identifying information from the coded bar on the back of the license. Transcript Vol. 1, at 14.

At 12:24 a.m., Officer Cowick radioed Dispatch to find the location of the officer on duty with a drug-sniffing dog (K-9).  See Transcript Vol. 2, at 217.  The K-9 Officer on duty was Adams County, Illinois, Deputy Sheriff Saalborn.  Quincy is located in Adams County, Illinois.  Dispatch told Officer Cowick that Deputy Saalborn was in an area of Adams County known as Sheridan, about six or seven miles away.  Transcript Vol. 1, at 90.   Officer Cowick told Officer Cirrincione that it was "guaranteed" that Gholston had drugs in the Truck.   Cowick said that Gholston kept the drugs in a magnetic box underneath the Truck.

At 12:25 a.m., while Officer Cowick and Cirrincione were at the squad car, Officer Hodges had a conversation with Gholston.  The video shows the interaction between Gholston and Hodges, but the recording does not contain an audio recording of their conversation.  At 12:25 a.m., Officer Hodges opened the driver's side door to the Truck, reached in, and returned to Gholston's position between the Truck and the squad car. Officer Hodges had retrieved Gholston's cell phone from the Truck.  See Transcript Vol. 1, at 93; Transcript Vol. 2, at 218.  Officer Hodges placed a cell phone on the bumper of the Truck and took the handcuffs off Gholston. Gholston picked up the cell phone that Officer Hodges had placed on the Truck bumper.  At 12:26 a.m., Gholston started talking on the cell phone.

At 12:26 a.m., Cowick asked Dispatch if someone could come to the scene to serve the NOV.  Quincy Police Sergeant Nathan Elbus responded that he could pick up the NOV and bring it to the scene to serve it. Transcript Vol. 1, at 22; see Transcript Vol. 2, at 140-41, 144-45.  Officer Cowick testified that he planned to detain Gholston until the NOV was served on Gholston.  Under Quincy Police Department policy or practice, he could detain a person in order to serve an outstanding NOV.  Transcript Vol. 1, at 42-45; Transcript Vol. 2, at 161-64, 207-08.  At 12:26 a.m., Sergeant Elbus began driving to the Quincy Police Station to get the NOV. Transcript Vol. 2, at 138-39.

At 12:26 a.m., Officer Cowick sent a text message to Sergeant Elbus's squad car.  The Quincy Police Department's squad car onboard computer systems could send instant messages or text messages between squad cars.  Officer Cowick was identified in the text messages by his badge number 143, Officer Cirrincione was identified by his badge number 120, and Sergeant Elbus was identified by his badge number 261. Transcript Vol. 1, at 99, 112, 198.  The text message said, "Trying to get Sam-12 here."  Ex. C, Car-to-Car Communications Log, at 3 of 12.   The term "Sam-12" referred to Deputy Saalborn.  A few seconds later, Cowick sent a second text message to Sgt. Elbus, which read, "take your time!!"

Transcript Vol.1, at 24.  Cowick testified that he sent these messages, "Just to tell Sergeant Elbus that he doesn't need to, you know, rush, break his back trying to get an NOV; that I'm gonna get K-9 here to sniff the car." Transcript Vol.1, at 25.

At 12:27 a.m., Officer Cirrincione returned to his squad car and contacted Deputy Saalborn to get him to come to the scene to conduct a K-9 free air sniff around the Truck while Cowick worked on completing the written warning.  Transcript Vol. 1, at 99-100; Transcript Vol. 2, at 202.  At 12:28 a.m., Officer Cirrincione sent a text to Officer Cowick informing him that Saalborn was on his way.  Transcript Vol. 2, at 202; Ex. C, Car-to-Car Communications Log, at 4 of 12.

At 12:28 a.m., Cowick spoke out the squad car window to Officer Hodges who was watching Gholston.  Officer Cowick asked Officer Hodges to ask Gholston for his current address to input that information into the computer to complete the warning.  At 12:28 a.m., Cowick also sent a text message to Deputy Saalborn, "261 had to pick up NOV, so he sint (sic) here yet, then I'll have to serve it."  Car-to-Car Communications Log, at 7 of 12.

At 12:28, Sergeant Elbus arrived at the Quincy Police Station (Station).  Transcript Vol. 2, at 139.  Sergeant Elbus estimated it took three

minutes to park, retrieve the NOV, get back to his car and exit the Station parking garage.  Transcript Vol. 2, at 145.  The Station was 1.2 miles away from the location of the traffic stop on Chestnut Street.  Sergeant Elbus estimated that it took about five minutes to drive from the Station to the traffic stop.  Transcript Vol. 2, at 146; Government Exhibit G, Google Maps Map of route from the Station to Fourth and Chestnut Streets.

At 12:29 a.m., Cowick spoke to Sergeant Elbus using the squad car cell phone.  Cowick asked if Elbus received his text.  Sergeant Elbus told Officer Cowick that he had not received the messages.  Officer Cowick said he would send the text again.  Transcript Vol. 1, at 28, 150.  At 12:29 a.m., Cowick sent two text messages to Sergeant Elbus.  The first said, "s12 is on his way," and the second said, "take yur (sic) time."  Car-to-Car Communications Log, at 6 of 12.  At 12:30 a.m., Cowick sent two messages to Deputy Saalborn, "drive fast," and "garanteee (sic) there is good amount." At 12:31 a.m. Deputy Saalborn replied, "trying."  Car-to-Car Communications Log, at 7 of 12.  At 12:32 a.m., Cowick sent two messages  to Sergeant Elbus, "s12 is coming from Sheridan," followed by, "So I'm hoping he can get here quick."  Car-to-Car Communications Log, at 8 and 9 of 12.  Sergeant Elbus testified that he did not recall seeing any of the texts Officer Cowick sent.  Sergeant Elbus, however, testified that his

normal procedure would be to have the app open that would allow him to see car-to-car text messages.  Transcript Vol. 2, at 184-86.

Officer Cowick testified that he never stopped working on the warning while he spoke to Cirrincione, Elbus, and Hodges, and sent and received the text messages from Elbus and Saalborn.  Transcript Vol. 1, at 100.

At 12:32 a.m., Officer Cowick completed and printed the warning. Transcript Vol. 1, at 30.  At 12:33 p.m., Cowick exited his squad car and asked Gholston if he had proof of insurance for the Truck.  Officer Cowick testified that he forgot to ask for proof of insurance initially.  He said that in a normal traffic stop, he walked up to the driver's side window of the vehicle and asked for proof of insurance, but this was not a normal traffic stop. Gholston had walked away from the Truck and Officer Cowick had to chase after him.  Cowick testified that , "In the midst of that, I did fail to remember to ask him for insurance."  Transcript Vol. 1, at 32. Gholston said his girlfriend had insurance on the Truck, but he did not have any proof of insurance.

At 12:34 a.m., Officer Cowick returned to the squad car to write the ticket for driving without proof of insurance.  Officer Cowick testified that he had to reenter all the identifying information into the computer to generate the ticket.  Transcript Vol. 1, at 118.  At 12:35 p.m., Officer Cowick told

either Officer Hodges or Cirrincione (Officer Cowick and the person to whom he was speaking were both out of the view of the camera) that it made no sense that one had to go back and start all over again to write the second ticket.

At 12:37 a.m., Deputy Saalborn arrived at the scene with the K-9.  At 12:37 a.m., the K-9 alerted on the Truck.  Officer Cowick told Gholston that the dog alerted and that they were going to search the Truck.  The officers found methamphetamine in the Truck.  At 12:38 a.m., Sergeant Elbus arrived at the traffic stop.  Transcript Vol. 2, at 139.  At 12:40 a.m., Gholston was placed under arrest for possession of methamphetamine.  Once the K-9 alerted, the NOV did not matter to Officer Cowick.  Transcript Vol. 1, at 101.  At 12:57 a.m., Sergeant Elbus reported that he served the NOV on Gholston and was cleared from the call.  Car-to-Car Communications Log, at 11 of 12.

## ANALYSIS

Gholston moves to suppress the drugs and any other evidence found at the April 29, 2019 search of the Truck and any post-arrest statements. Gholston argues that the search violated his Fourth Amendment rights to be free from unreasonable searches and seizures because Officer Cowick unreasonably delayed and extended the stop past the time necessary to

complete the traffic stop, and Officer Cowick did not have reasonable suspicion based on articulable facts that Gholston was engaged in criminal activity necessary to justify detaining Gholston past the time needed to complete the traffic stop.

An officer may stop a vehicle if he has probable cause to believe the driver of the vehicle is committing a traffic violation. The officer further may conduct a free-air sniff around the vehicle by a trained drug-sniffing dog during the course of the traffic stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005). The officer, however, may not detain the vehicle and its occupants longer than would be reasonably necessary to complete a traffic stop in order to conduct the free-air sniff, unless the officer has some other basis for detaining the vehicle. Rodriguez v. United States, __ U.S. __, 135 S.Ct. 1609, 1612 (2015). An additional valid basis to detain the vehicle beyond the time necessary to conduct a traffic stop exists if the officer has reasonable suspicion of criminal activity, such as possession of illegal drugs. Id. at 1616; see United States v. Guidry, 817 F.3d 997, 1005 (7th Cir. 2016).

An officer may also detain a vehicle and its occupants if he has probable cause that the occupants are carrying illegal drugs. An officer with such probable cause may search the vehicle. Caballes, 543 U.S. at

407; see Guidry, 817 F.3d at 1005 (The officers conducting a traffic stop had an additional independent basis to detain a vehicle once a narcotic sniffing dog indicated that drugs were present).

In this case, Officer Cowick may have extended the stop for a minute or two beyond the time he needed to conduct the traffic stop. Gholston's refusal to provide his driver's license and Officer Cowick's failure to ask for proof of insurance at the beginning of the stop accounted for most of the time taken to complete the stop. The delay caused by Gholston's refusal to provide his license cannot be a basis to invalidate the search. See U.S. v. Sharpe, 470 U.S. 675, 687-88 (1985) The Court further finds that Officer Cowick made an innocent mistake when he failed to ask for proof of insurance initially. The mistake was associated with Gholston's decision to walk away from the traffic stop. This changed Officer Cowick's routine and accounted for the failure to ask about insurance initially. Officer Cowick did not delay asking about insurance to draw out the stop. See U.S. v Lopez, 907 F.3d 472, 486 (7th Cir. 2018).

Still, Officer Cowick wanted to continue the traffic stop until Deputy Saalborn could arrive with the K-9. Officer Cowick spoke with Officer Hodges privately about the fact that he believed Gholston was carrying methamphetamine in the Truck. He interrupted his preparation of the

written warning to send messages to Sergeant Elbus telling him to take his time with the NOV, to talk to Sergeant Elbus on the phone, and to send a message to Deputy Saalborn to hurry up because he would have to let Gholston go once he served the NOV. These activities did not take significant amounts of time, but these activities delayed completing the traffic stop.

The Court, however, does not need to decide whether Officer Cowick unreasonably delayed completing the traffic stop because Officer Cowick had reasonable suspicion based on articulable facts that Gholston was distributing methamphetamine from the Truck. Office Cowick, therefore, had a proper basis to detain Gholston until Deputy Saalborn arrived and the K-9 alerted on the Truck.

Reasonable suspicion is "something less than probable cause but more than a hunch." United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005).

> Reasonable suspicion is not an onerous standard: Reasonable suspicion requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause to effect an arrest. United States v. Esquivel– Rios, 725 F.3d 1231, 1236 (10th Cir. 2013). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." Id. (quoting Poolaw v. Marcantel, 565 F.3d 721, 736 (10th Cir. 2009)). Indeed, we have held that factors consistent with innocent travel may contribute to reasonable suspicion.

United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002). As
long as an officer has "a particularized and objective basis for
suspecting an individual may be involved in criminal activity, he
may initiate an investigatory detention even if it is more likely
than not that the individual is not involved in any illegality."
United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).

United States v. Petit, 785 F.3d 1374, 1379-80 ((10th Cir. 2015) (emphasis

in the original) (cited with approval in United States v. Sanford, 806 F.3d

954, 959 (7th Cir. 2015)).   The existence of reasonable suspicion is an

objective inquiry based on the totality of the circumstances.  United States

v. Lewis, 920 F.3d 483, 493 (7th Cir. 2019).

In this case, Officer Cowick had learned several articulable facts that

supported his suspicion that Gholston was dealing methamphetamine.  The

totality of the circumstances in this case demonstrate that Officer Cowick

had reasonable suspicion.  Toolate told Officer Cowick that Gholston was

dealing methamphetamine from a green truck with a toolbox.  Toolate had

provided useful information to Officer Cowick in the past.  A tip from a

known informant is more reliable because her "reputation can be assessed"

and she can be "held responsible if her allegations turn out to be

fabricated."  Florida v. J.L., 529 U.S. 266, 270 (2000).  Toolate had also

been involved in a relationship with a member of Gholston's family and so

had an additional basis for knowing about Gholston's activities.  Toolate

also told Officer Cowick where Gholston parked his truck.  Officer Cowick

confirmed that a green truck with a toolbox was parked at the location given by Toolate.  Officer Cowick also asked individuals who had been convicted of possession of methamphetamine for information about who was dealing methamphetamine.  Several of these individuals told Officer Cowick that Gholston sold methamphetamine out of a green truck like the truck in the traffic stop.  These individuals used methamphetamine and knew who sold methamphetamine in Quincy.  Their statements, along with the Toolate's connection to Gholston's family and her accurate information about the location of the truck, tended to corroborate Toolate's story.  See United States v. Lopez, 907 F.3d 472, 482 (7th Cir. 2018) ("The reasonable-suspicion standard requires police to verify at least some facts supporting the informant's allegation of criminal activity before seizing the subject of the tip.").

In addition, Officer Cowick confirmed with other officers that Gholston had been a methamphetamine dealer in the past and had been convicted of drug trafficking.  He also confirmed that Gholston had multiple convictions for drug trafficking, was at one time a top dealer in Quincy, and had just gotten off federal supervised release for a methamphetamine-related crime.  These prior convictions provided additional information to support Officer Cowick's reasonable suspicion.  See United States v. Finke,

85 F.3d 1275, 1282 (7th Cir. 1996) (Prior drug convictions were a factor to support a finding of reasonable suspicion).

On April 29, 2018, when Officer Cowick turned around and followed the Truck, Gholston turned the corner, parked the Truck, and tried to walk away. Officer Cowick ordered Gholston to return to the Truck, but Gholston continued to walk away even after making eye contact with Officer Cowick. Gholston's attempt to get away from the Truck after Officer Cowick turned on his emergency lights again corroborated the other information that the Truck may have contained drugs. See D.Z. v. Buell, 796 F.3d at 755-56 (7th Cir. 2015) (attempting to evade law enforcement can be a factor in determining probable cause).

In addition, Gholston also first told Officer Cowick he did not see the squad car's emergency lights and then told Officer Cowick that he did not turn on the emergency lights until he was right up on the Truck. The Government correctly points out that these two statements are inconsistent. Gholston either saw the emergency lights or he did not. Such inconsistent statements added to the totality of the circumstances that supported Officer's Cowick's reasonable suspicion. See United States v. Davis, 636 F.3d 1281, 1291 (10th Cir. 2011) (cited with approval in Sanford, 806 F.3d at 959).

All of this information, together, provided "a particularized and objective basis for suspecting" that Gholston "may be involved in criminal activity."  Baskin, 401 F.3d at 791.[3]  Officer Cowick had reasonable suspicion to support initiating "an investigatory detention even if it is more likely than not that the individual is not involved in any illegality."  Id.

Gholston argues that each piece of information on which Officer Cowick relied was not sufficient to constitute reasonable suspicion. Reasonable suspicion is determined by looking at the totality of the circumstances facing the officer, not by evaluating individual factors separately.  Indeed, factors may not be sufficient in and of themselves but may be part of a totality of circumstances that establish reasonable suspicion.  Lewis, 920 F.3d at 493; United States v. Winters, 782 F.3d 289, 298 (7th Cir. 2015).  That is what occurred here. Officer Cowick had reasonable suspicion that Gholston was selling methamphetamine out of the Truck at the time of the April 29, 2018 traffic stop.

---

[3] The Government also relied on evidence that Gholston would not permit Officer Cowick to enter the Truck to retrieve Gholston's driver's license and that Gholston appeared nervous when Officers Hodges and Cirrincione looked into the Truck.  Gholston argues that he did not appear nervous on the audio-video recording when the Officers looked into the Truck.  Gholston also points out that he later gave Officer Hodges permission to go into the Truck to get his cell phone.  Gholston argues that this evidence negates any inference that he was worried about the Officers looking into the Truck.  For purposes of this Report and Recommendation only, the Court assumes that Gholston was not anxious about the Officers looking into the Truck.  The other information Officer Cowick had learned provided him with reasonable suspicion regardless of whether Gholston was nervous about the Officers looking into the windows of the Truck.

Because Officer Cowick had reasonable suspicion based on articulable facts, he could extend the traffic stop until Deputy Saalborn arrived with the K-9.  <u>Lewis</u>, 920 F.3d at 492-93.  Once Deputy Saalborn's K-9 alerted on the Truck, Officer Cowick had probable cause to search the Truck.  <u>Caballes</u>, 543 U.S. at 407; <u>see</u> <u>Guidry</u>, 817 F.3d at 1005.  The methamphetamine was, thus, found pursuant to a valid search based on probable cause.  Gholston's arguments to the contrary are not persuasive.

THEREFORE, THIS COURT RECOMMENDS that Defendant Jacques Gholston's Motion to Suppress (d/e 8) should be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local Rule</u> 72.2.

ENTER:  May 20, 2019

_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE